

11/17/14

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SABRINA MILO | **MEMORANDUM & ORDER** |
| Plaintiff, | |
| – against – | 14-CV-1172 |
| THE CITY OF NEW YORK and Police Officer GREG E. EVERT, | |
| Defendants. | |

**Parties**

Sabrina Milo

The City of New York and
Police Officer Greg E. Evert

**Appearances**

Daniel I. Neveloff
111 John Street, Suite 800
New York, NY 10038
(212) 964-2066
daniel@neveloff.com

Brian Jeremy Farrar
New York Law Dept.
Corporation Counsel
100 Church Street, Room 3-312
New York, NY 10007
(212) 356-2377
bfarrar@law.nyc.gov

1



JACK B. WEINSTEIN, Senior United States District Judge:

## Table of Contents

I.    Introduction ................................................................................................................2
II.   Facts.......................................................................................................................4
III.  Fed. R. Civ. P. 12(c) Judgment on the Pleadings Standard .................................7
IV.  Law ........................................................................................................................8
   A.  Statute.............................................................................................................8
   B.  Municipal Liability Standard........................................................................8
   C.  False Arrest and False Imprisonment Under Fourth Amendment Standard ......9
   D.  Excessive Force Under Fourth Amendment Standard ................................10
      1.  De Minimis Injuries ...............................................................................10
      2.  Verbal Harassment.................................................................................11
   E.  Free Speech Under First Amendment Standard ..........................................11
      1.  Clear and Present Danger.......................................................................12
      2.  Regulation of Speech Inside Schoolhouse Walls....................................13
   F.  Unconstitutional Confinement and Deliberate Indifference to Medical Needs Under Due Process Clause of Fourteenth Amendment Standard ......................................14
      1.  Components of Deliberate Indifference Rule .........................................15
      2.  Parties That May Be Held Liable............................................................16
V.    Application of Law to Facts ................................................................................18
   A.  Municipal Liability Claim ..........................................................................18
   B.  False Arrest and False Imprisonment Claims..............................................18
   C.  Excessive Force Claim ...............................................................................19
   D.  Free Speech Claim......................................................................................20
   E.  Unconstitutional Confinement and Deliberate Indifference to Medical Needs Claim......20
VI.  Conclusion...........................................................................................................21

## I.    Introduction

Frustrated by a critical letter from her assistant principal, Sabrina Milo, an art teacher at a public high school in Brooklyn, announced in the school's teachers' lounge: "[I]f I had a trench coat and a shotgun, it would be Columbine all over again." The reference to Columbine evoked memories of a terrorist gun attack on young students that left twelve students and one teacher dead, and twenty-one wounded. Her statement was a modern analogue to that of Justice Oliver Wendell Holmes Jr.'s illustration of what was beyond the pale: shouting fire in a theater.

Upset, three days later three teachers filed written descriptions of the incident. One of them wrote that when she asked Milo to retract her statement, the response was: "Don't worry, I won't get you."

The three eyewitness statements were provided to police. Milo was arrested. Probable cause existed to arrest her for a violation of New York Penal Law section 490.20, defining a terrorist threat.

Prosecutorial investigation quickly revealed that plaintiff lacked the requisite *mens rea*—there was no intent to do harm. Exercising common sense, authorities quickly released Milo on bail and then dismissed all charges.

On the undisputed facts, defendants' motion to dismiss is granted with respect to plaintiff's *Monell* claim against the City and her free speech, false arrest, and false imprisonment claims against the one named officer.

Were it not for the three year statute of limitations applicable to claims brought pursuant to section 1983 of Title 42, what would remain open is plaintiff's claim that, while she was held at the police station and chained to a pole for nine hours, one or more police officers withheld all liquids from her after being informed that her medical condition—hypoglycemia—required continuous hydration. Even were she a terrorist, she had a right to humane imprisonment. The Constitution does not permit abusing municipal prisoners by deliberately denying them necessary medical relief, a violation of the due process clause of the Fourteenth Amendment.

Plaintiff, however, did not name as a defendant the officer or officers who had been informed of her medical need and then withheld the simple remedy—water. Nor did she name any person in charge of the precinct's operation or any officer who witnessed the incident and had a duty to intervene.

Plaintiff seeks to amend the complaint. Because the three year statute of limitations has run, an amendment would be futile. Amendment is denied.

The case is dismissed.

## II. Facts

Plaintiff started teaching art at Fort Hamilton High School ("Fort Hamilton") in 2001. Am. Compl. ¶ 12, Sept. 15, 2014, ECF No. 13-3. Ten years later, on March 29, 2011, during the noon lunch break, she entered the teachers' lounge shaking and crying. *Id.* ¶¶ 14, 17. She had just received a communication from the assistant principal informing her that she had made inappropriate comments to a student. *Id.* ¶ 14. Feeling unfairly targeted, she vented her exasperation to other teachers. *Id.* ¶¶ 15, 17. They included Gloria Mingione, Alan Zeitland, Johnny Rosero, Nanetta Lopinto, Kalli Zervos and Terry Papantonio. *Id.* ¶ 17.

Plaintiff told Mingione: "[I]f I had a trench coat and a shotgun, *it would be Columbine*[—a reference to the April 20, 1999 mass shooting of high school students at Columbine High School in Littleton, Colorado—]*all over again.*" *Id.* ¶ 18 (emphasis added). Mingione cautioned: "[D]on't say that." *Id.* Plaintiff responded: "I'm sorry. I'm just so frustrated right now. This is how I feel." *Id.* Mingione shook her head, mouthing the word "no." *Id.*

Plaintiff then returned to her classroom. *Id.* ¶ 22. She worked two more days without incident. *Id.* ¶¶ 23–24.

On April 1, 2011, three days after the event, three teachers submitted statements describing the incident:

- Mingione wrote: On Tuesday, March 29, 2011, during lunch (7th period), Sabrina Milo was very upset and told me that she wanted to bring a machine gun under a trench coat to school. I said to her – "Sabrina—don't say that[,]" to which she replied, "Oh, I'm serious—*it is going to be Columbine all over again.*"

4

Again, I repeated – "You don't say that!" She said, "Don't worry, I won't get you."

- Rosero wrote: On Tuesday, March 29, 2011, during 7th period (approximately 12:30 p.m.), Sabrina Milo, Teacher of Art, was sitting at the table in the Teachers['] Lounge, room 319, and crying. Ms. Milo engaged Gloria Mingione in conversation regarding why she was upset and what she wanted to do about it. She said that she wanted to bring a machine gun and that it would be "*Columbine all over again.*"

  Ms. Mingione gave her three opportunities to retract the statement or amend it, but she did not, other than clarifying that she "wouldn't get" her (Ms. Mingione).

- Zeitlin wrote: While using the computer in the English lounge, Ms. Milo was speaking and *used the phrase "come in in a trench coat."* It was at that point that I told her she should not say such a thing even in jest, because someone could get the wrong idea. This phrase is associated with causing violence in a school. I did not interpret this to be a threat, however, the statement is a troubling one.

  When I said to her that she shouldn't joke about such things, she did not answer me so I believed she realized that she should not have made such a comment that she might "come in in a trench coat" one day.

Farrar Decl., Exs. B–D, Aug. 25, 2014, ECF No. 10 (emphasis added).

On the same morning that these teachers submitted their recollections, plaintiff was asked by her department supervisor to attend an unscheduled meeting in his office and to bring all of her belongings. Am. Compl. ¶ 25. Shortly after noon, four uniformed New York Police Department officers entered the department supervisor's office. *Id.* ¶ 26. Officer Greg E. Evert asked plaintiff if she was Sabrina Milo. *Id.* She responded: "Yes." *Id.* Evert then informed plaintiff that she was under arrest. *Id.* Plaintiff was handcuffed and escorted out of the school into a police van. *Id.* According to Milo, "[t]he handcuffs were secured tightly, but the police officers refused to loosen them despite [my] request [that they do so]." *Id.*

At the 68th precinct, plaintiff was allegedly handcuffed to a pole from 1:00 p.m. to 10:00 p.m. *Id.* ¶¶ 27–28. She was unhandcuffed to be processed, to use the restroom and to see her attorney. *Id.* ¶ 28. Plaintiff told at least one police officer that she suffered from

5

hypoglycemia, a medical condition, and that she was required to drink large amounts of water. *Id.* ¶ 30. She was not provided with food or drink. *Id.* ¶ 29. Officers at the precinct mocked her, stating: "Why are you being a cry baby? You're a terrorist." *Id.* At one point, when she requested water, an officer asked if she had a dollar. *Id.* ¶ 30. When she answered "No," he reportedly said: "I guess you're not getting water then." *Id.*

Finally, acting on the advice of her attorney, plaintiff demanded that she be taken to a hospital. *Id.* ¶ 31. Without delay, Emergency Medical Services arrived at the precinct and took her to Lutheran Medical Center. *Id.* She was treated at the hospital while handcuffed. *Id.* ¶ 33. At 6:00 a.m., plaintiff was brought back to the 68th precinct. *Id.* ¶ 34.

At the precinct, unidentified police officers and staff held newspapers with plaintiff's photograph on the front page. *Id.* ¶ 36(a). Some allegedly pointed to these newspapers and then to plaintiff and laughed. *Id.*

Plaintiff was arraigned and charged with "Making a terroristic threat." *Id.* ¶ 36(b); N.Y. Penal Law § 490.20 (McKinney 2014). The first paragraph of New York Penal Law section 490.20 requires proof of intent to cause some form of criminal harm. The second paragraph provides that it is no defense that the defendant did not have the intent or capacity to commit the terroristic act threatened. It reads:

1. A person is guilty of making *a terroristic threat when with intent to intimidate* or coerce a civilian population, influence the policy of a unit of government by intimidation or coercion, or affect the conduct of a unit of government by murder, assassination or kidnapping, *he or she threatens to commit or cause to be committed a specified offense* [here of shooting to kill many children] *and thereby causes a reasonable expectation or fear* of the imminent commission of such offense.

2. It shall be *no defense* to a prosecution pursuant to this section *that the defendant did not have the intent or capability of committing the specified offense* or that the threat was not made to a person who was a subject thereof.

N.Y. Penal Law § 490.20 (emphasis added).

The criminal complaint by Officer Evert indicated that he was "informed by Gloria Mingione that . . .[defendant] while in the presence of other teachers in the teachers[' lounge] . . . stated to the informant in sum and substance that defendant wanted to bring a machine gun under a trench coat to school and that it will be Columbine all over again." Am. Compl. ¶ 41. Evert stated he was told "by the informant that the . . . described actions cause[d] informant to beco[m]e alarmed." *Id.*

Plaintiff was taken to Riker's Island at 2:00 p.m. on April 2. *Id.* ¶ 37. She was held at Riker's until 1:00 p.m. on April 3, at which time she was transferred to Elmhurst Psychiatric Hospital. *Id.* ¶ 38. A psychiatrist at Elmhurst ordered her to remain at the hospital for twenty-four hours. *Id.* ¶ 39. She was released from Elmhurst at 3:00 p.m. on April 4. *Id.*

On April 15, 2011, charges against plaintiff were dismissed. *Id.* ¶ 42.

In her complaint, plaintiff alleges that the City of New York "had a policy, custom or practice of investigation or addressing allegations related to 'terrorism' in a manner that displayed a deliberate indifference to the constitutional rights of those within its jurisdiction and to [p]laintiff herein." *Id.* ¶ 103. The City, she claims, failed "to train its employees to handle recurring situations (*i.e.*, stops and arrests related to 'terrorism' without probable cause)." *Id.* ¶ 105.

### III. Fed. R. Civ. P. 12(c) Judgment on the Pleadings Standard

Rule 12(c) permits a party to move for judgment on the pleadings "after the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). Granting judgment on the pleadings is appropriate when, after reviewing the record, the court is convinced that the plaintiff has failed to set forth a plausible claim for the requested relief based on the evidence presented. *Hoyden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). In deciding a Rule 12(c) motion, the

same standard applicable to dismissals pursuant to Fed. R. Civ. P. 12(b)(6) is employed. *Id.* at 160. All factual allegations in the complaint must be accepted as true and reasonable inferences must be drawn in favor of the plaintiff. *Id.* To withstand a motion for judgment on the pleadings, the "well-pleaded factual allegations, assumed to be true, [must] plausibly give rise to an entitlement to relief." *Id.* at 161 (internal quotation marks and citation omitted). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks and citation omitted).

## IV.    Law

### A.    Statute

Plaintiff sues under section 1983 of Title 42 of the United States Code. Section 1983 provides a remedy for individuals who have been deprived of their constitutional rights by one or more government employees or government entities. It reads:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law.

42 U.S.C. § 1983.

### B.    Municipal Liability Standard

A municipality can be found liable under section 1983 only where the municipality itself causes the constitutional violation at issue. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."). "To hold a city liable under [section] 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be

8

subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007) (internal quotation marks and alterations omitted). *See also Robishung-Walsh v. Nassau Cnty. Police Dep't*, 699 F. Supp. 2d 563, 566 (E.D.N.Y. 2010) (explaining that, in order to establish liability of a municipality premised on "deliberate indifference to constitutional rights," a plaintiff must allege facts that if true would prove that "municipal policymakers made a 'deliberate choice from among various alternatives' not to fully train employees" (citing *City of Canton v. Harris*, 489 U.S. 372, 389 (1989))).

### C.    False Arrest and False Imprisonment Under Fourth Amendment Standard

False arrest and false imprisonment are not independent causes of action under the Fourth Amendment. False arrest is considered false imprisonment and the claims are analyzed identically. *See, e.g., Singer v. Fulton Cnty Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (describing false arrest claim as a type of false imprisonment claim and stating that the claims are analyzed in an identical manner). The Fourth Amendment, made applicable to the states by the Fourteenth Amendment, provides: "The right of people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. An arrest made without probable cause violates this Fourth Amendment right. *Covington v. City of New York*, 171 F.3d 117, 122 (2d Cir. 1999).

The existence of probable cause to arrest for any criminal offense—even an offense other than the one identified by the arresting officer at the time of arrest—defeats a false arrest Fourth Amendment claim. *Devenpeck v. Alford*, 543 U.S. 146, 154–55 (2004). Probable cause exists "when the arresting officer has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the

person to be arrested has committed or is committing a crime.'" *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (citation omitted).

Whether probable cause exists depends upon the reasonable objective conclusion to be drawn from the facts known to the arresting officer and those working with him or her at the time of the arrest. *See Maryland v. Pringle*, 540 U.S. 366, 371 (2003). *See also Betts v. Shearman*, 751 F.3d 78, 83 (2d Cir. 2014) ("A police officer's purpose 'is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence.'") (citation omitted). Law enforcement officials have probable cause to arrest if they receive information from persons, "normally the putative victim[s] or eyewitness[es], who it seems reasonable to believe [are] telling the truth." *Miloslavsky v. AES Eng'g Soc., Inc.*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992), *aff'd*, 993 F.2d 1534 (2d Cir. 1993).

### D.     Excessive Force Under Fourth Amendment Standard

Fourth Amendment excessive force claims brought under section 1983 require that force be exerted under the color of state law. *Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009) (citing *Posr v. Doherty*, 944 F.2d 91, 94–95 (2d Cir. 1991)). Police officers' application of force is excessive if it is objectively unreasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989).

### 1.     De Minimis Injuries

"Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* at 396 (internal quotation marks and citation omitted).

> [T]he [Court of Appeals for the] Second Circuit and district courts in the Circuit recognize the concept of 'de minimis' injury and, when the injury resulting from alleged

excessive force falls into that category, the excessive force claim is dismissed. Injuries held to be de minimis for purposes of defeating excessive force claims include short-term pain, swelling, and bruising, brief numbness from tight handcuffing, claims of minor discomfort from tight handcuffing, and two superficial scratches with a cut inside the mouth.

*Lemmo v. McKoy*, No. 08-CV-4264, 2011 WL 843974, at *5 (E.D.N.Y. Mar. 8, 2011) (citations omitted). While "overly tight handcuffing can constitute excessive force," the lack of a continuing injury beyond temporary discomfort "is fatal to [an] excessive force claim." *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008).

### 2. Verbal Harassment

"[A]llegations of verbal harassment are insufficient to base a [section] 1983 claim if no specific injury is alleged." *Johnson v. Eggersdorf*, 8 F. App'x 140, 143 (2d Cir. 2001). Verbal harassment or profanity alone, "unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem," does not constitute the violation of any federally protected right and therefore is not actionable under section 1983. *Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) (collecting cases); *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) (per curiam) (same).

### E. Free Speech Under First Amendment Standard

The First Amendment to the Constitution reads: "Congress shall make no law . . . abridging the freedom of speech." "To recover on a [F]irst [A]mendment claim under [section] 1983, a plaintiff must demonstrate that his [or her] conduct is deserving of [F]irst [A]mendment protection and that the defendants' conduct of harassment was motivated by or substantially caused by [plaintiff's] exercise of free speech." *Rattner v. Netburn*, 930 F.2d 204, 208 (2d Cir. 1991) (internal quotation marks and citation omitted); *see also DeFabio v. E. Hampton Union Free Sch. Dist.*, 658 F. Supp. 2d 461, 473 (E.D.N.Y. 2009) ("It is axiomatic that 'freedom to

speak on government property is largely dependent on the nature of the forum in which the speech is delivered.'" (citing *Bronx Household of Faith v. Cmty. Sch. Dist. No. 10*, 127 F.3d 207, 211 (2d Cir. 1997))); *Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 625 (2d Cir. 2005) ("[T]he level of judicial scrutiny that must be applied to state actions inhibiting speech varies with the nature of the forum in which the speech occurs.").

### 1.    Clear and Present Danger

"Freedom of speech . . . is not an unfettered right for any U.S. citizen." *D.F. ex rel. Finkle v. Bd. of Educ. of Syosset Cent. Sch. Dist.*, 386 F. Supp. 2d 119, 125 (E.D.N.Y. 2005) *aff'd sub nom. D.F. v. Bd. of Educ. of Syosset Cent. Sch. Dist.*, 180 F. App'x 232 (2d Cir. 2006). "Speech that constitutes a true threat of violence, by being a serious expression of an intent to cause present or future harm, may be prohibited." *Id.* (internal quotation marks and citation omitted).  The speaker of a true threat does not need to have the intention of carrying out the threat. *Virginia v. Black*, 538 U.S. 343, 359–60 (2003).  The prohibition on true threats is meant to "protect[] individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur." *R.A.V. v. St. Paul*, 505 U.S. 377, 388 (1992).

"The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent." *Schenck v. United States*, 249 U.S. 47, 52 (1919). "It is a question of proximity and degree." *Id.*  "[T]he character of every act depends upon the circumstances in which it is done." *Id.*  "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic." *Id.*  "The freedom to exercise one's right of free speech is often curtailed temporally, geographically or

even demographically." *United States v. Turner*, No. 09-CR-00650, 2009 WL 7265601, at *1

(E.D.N.Y. Oct. 5, 2009).

### 2.    Regulation of Speech Inside Schoolhouse Walls

The Supreme Court has issued several opinions providing guidelines on how to balance

First Amendment rights to free speech in schools against a school's need to ensure the sound

education and safety of its students.  These opinions set forth three different categories of speech:

- The first includes vulgar, lewd, obscene, and plainly offensive speech.  *Bethel Sch. Dist. No. 403 v. Fraser*, 478 U.S. 675, 684–85 (1986) (holding that the First Amendment did not protect a student's vulgar speech at a school assembly, which was unrelated to any political viewpoint).

- The second involves school-sponsored speech.  *Hazelwood Sch. Dist. v. Kuhlmeier*, 484 U.S. 260, 271–73 (1988) (holding that school officials may censor the content of school newspapers).

- The third includes all other speech that falls in neither of the first two categories. *Compare Morse v. Frederick*, 551 U.S. 393, 396, 409–10 (2007) (holding that speech posing a direct threat to the safety of the school population is not protected by the First Amendment) *with Tinker v. Des Moines Ind. Cmty. Sch. Dist.*, 393 U.S. 503, 505, 514 (1969) (holding that a school could not prohibit students from wearing black armbands to protest the Vietnam War).

*Cf. R.O. ex rel. Ochshorn v. Ithaca City Sch. Dist.*, 645 F.3d 533, 540 (2d Cir. 2011) (discussing

these categories of speech).

Speech concerning violence "bearing the stamp of a well-known pattern of recent historic

activity:  mass, systematic school-shootings in the style that has become painfully familiar in the

United States"—"pertaining to grave harms arising from the particular character of the school

setting"—is not protected by the First Amendment.  *Ponce v. Socorro Indep. Sch. Dist.*, 508 F.3d

765, 770–72 (5th Cir. 2007); *see also Morse*, 551 U.S. at 424 (Alito J., concurring) (explaining

that because school attendance creates a captive group of persons protected only by limited

school personnel "school officials must have greater authority to intervene before speech leads to

13

violence"). The Court of Appeals for the Second Circuit made it explicit in *Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.* that "[w]hether [the issuer of the speech inside the schoolhouse] intended his or [her] 'wish' as a joke or never intended to carry out the threat is irrelevant[;] [n]or does it matter that [he or she] lacked the capacity to carry out the threat expressed." 677 F.3d 109, 114 (2d Cir. 2012). Speech on school grounds may be suppressed "to prevent material disruption" in schools. *Id.* at 112. Teachers are held to no lower standards than the students.

### F. Unconstitutional Confinement and Deliberate Indifference to Medical Needs Under Due Process Clause of Fourteenth Amendment Standard

The due process clause of the Fourteenth Amendment governs claims regarding the conditions of pretrial detainees. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). Included are deliberate indifference to medical needs. *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996). The Fourteenth Amendment reads:

> No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const. amend. XIV.

Under the due process clause, government officials may subject a pretrial detainee to restrictions that are inherent in confinement for detention so long as those conditions do not "amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). "A condition of confinement that is not reasonably related to a legitimate government objective supports an inference of a punitive intent." *Cano v. City of New York*, No. 13-CV-3341, 2014 WL 4494169, at *9 (E.D.N.Y. Sept. 12, 2014) (internal quotation marks and citation omitted).

If the conditions do not amount to "punishment," allegations that defendants have denied plaintiff access to basic human needs are evaluated under a standard of "deliberate indifference." *Rodriguez v. City of New York*, No. 14-CV-5172, 2014 WL 4629034, at *3 (E.D.N.Y. Sept. 12,

14

2014). The standard requires a plaintiff to establish both that his or her conditions of confinement fell below the "minimal civilized measure of life's necessities," and that defendants knew of and disregarded an excessive risk to the detainee's health or safety. *Id.* Allegations that defendants have denied a detainee access to basic human needs such as food and water are evaluated under the deliberate indifference standard. *See Butler v. Fletcher*, 465 F.3d 340, 344–46 (8th Cir. 2006) (holding "that deliberate indifference is the appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care, and reasonable safety (cited approvingly in *Caiozzo v. Koreman*, 581 F.3d 63, 71 n.4 (2d Cir. 2009))). "Claims for deliberate indifference to a serious medical condition or other serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." *Caiozzo*, 581 F.3d at 72.

### 1. Components of Deliberate Indifference Rule

The Court of Appeals for the Second Circuit has held that defendants may be found liable if they are "denied treatment needed to remedy a serious medical condition and did so because of [ ] deliberate indifference to that need." *Weyant*, 101 F.3d at 856. The deliberate indifference rule contains both an objective and a subjective component. *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).

"To meet the objective element, the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his [or her] health." *Id.* (citation omitted). "[P]risoners may not be deprived of their basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—and they may not be exposed to conditions that

pose an unreasonable risk of serious damage to their future health." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (internal quotation marks and citation omitted).

The Court of Appeals holds that the following objective conditions can be found to violate due process: (1) exposure to extreme temperatures without proper ventilation; (2) deprivation of sleep; (3) egregiously unsanitary cell conditions; (4) failure to provide toiletries, especially toilet paper; (5) situations in which prisoners are at substantial risk of serious harm from other inmates; and (6) overcrowding, particularly if combined with other adverse conditions. *Walker*, 717 F.3d at 126–29 (collecting cases). *See also Boadi v. City of New York*, No. 12-CV-2456, 2012 WL 3062063, at *4 (E.D.N.Y. July 26, 2012) (finding that deprivation of access to the bathroom for eighteen hours amounted to a serious deprivation of human needs); *Deblasio v. Rock*, No. 9-CV-1077, 2011 WL 4478515, at *15–16 (N.D.N.Y. Sept. 26, 2010) (alleged denial of bathroom access for five hours despite plaintiff's complaints survived summary judgment).

"Subjectively, the charged official must act with a sufficiently culpable state of mind . . . such as a deliberate indifference to inmate health or safety." *Walker*, 717 F.3d at 125 (internal quotation marks and citation omitted). The Court of Appeals explained:

> To constitute deliberate indifference, the prison official must know of, and disregard, an excessive risk to inmate health or safety. Evidence that a risk was obvious or otherwise must have been known to a defendant may be sufficient for a fact finder to conclude that the defendant was actually aware of [the] risk.

*Id.* (internal quotation marks and citations omitted).

## 2.     Parties That May Be Held Liable

An officer responsible for denial of medical services may be held liable. Officers that fail to intercede to prevent the constitutional violation of a plaintiff's rights may also be named. *See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("It is widely recognized that all law

enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence. An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know . . . that any constitutional violation has been committed by a law enforcement official.") (citations omitted); *see also, e.g., Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (same); *Brooks v. Cnty. of Nassau*, No. 14-CV-3107, 2014 WL 5093277, at *5 (E.D.N.Y. Oct. 9, 2014) (same).

In the event a claimant cannot identify the person or persons directly responsible for a section 1983 constitutional violation, she may name a person responsible for discipline within the stationhouse. *See Nielsen v. City of Rochester*, No. 11-CV-6196, 2014 WL 5790879, at *4–5 (W.D.N.Y. Nov. 6, 2014) ("There are many ways in which a supervisory official may be deemed to have been personally involved in a constitutional violation: [(1)] '[a] supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong[;] [(2)] [a] supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue[; and] [(3)], a supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event.'" (citing *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986))). *But cf. Turkmen v. Ashcroft*, 915 F. Supp. 2d 314, 333–36 (E.D.N.Y. 2013) (discussing the effect of *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), on supervisory liability in civil rights cases, and holding that *Iqbal* meant to require the supervisor to share the same mental state as the primary tortfeasor in order to be liable). The officer or officers in charge of a stationhouse have a responsibility to take appropriate steps to ensure against a prisoner's abuse.

## V. Application of Law to Facts

### A. Municipal Liability Claim

Plaintiff's *Monell* liability theory is premised on the fact that the City of New York did not adequately train its officers to handle arrests related to terrorism. Am. Compl. ¶¶ 103–5. Such generalized allegations that the City adopted an official policy or custom that deprived plaintiff of her constitutional rights are insufficient to state a *Monell* claim. *See supra* Parts III & IV.B. They are not supported by any facts tending to show that the City caused any claimed constitutional violation.

Defendants' motion to dismiss plaintiff's municipal liability claim is granted.

### B. False Arrest and False Imprisonment Claims

Police had probable cause to arrest plaintiff for making a terrorist threat. *See supra* Part IV.C. Mingione, an eyewitness in the teachers' lounge, who appeared to be reliable, informed Officer Evert that Milo expressed a desire to "bring a machine gun under a trench coat to school" and that plaintiff's statement that "it will be Columbine all over again" caused her to "beco[m]e alarmed." Am. Compl. ¶ 41. This eyewitness statement, provided to the police on April 1, 2011, was corroborated by two other teachers on the same day. *See* Farrar Decl., Exs. B–D. Evert had reasonably trustworthy information sufficient to warrant a person of reasonable caution in believing that plaintiff had committed a crime. *See Escalera*, 361 F.3d at 743; *see also Miloslavsky*, 808 F. Supp. at 355 (finding that law enforcement officials have probable cause to arrest if they receive information from persons, normally the putative victims or eyewitnesses, who it seems reasonable to believe are telling the truth).

Plaintiff cannot undermine the existence of probable cause by arguing that her statement should not have been taken seriously, that the teachers in the teachers' lounge issued their written

statements too late, or that she does not meet the requirements of New York Penal Law section 490.20. *See Betts v. Shearman*, 751 F.3d at 83 (noting that the function of police officers is to "apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence") (internal quotation marks and citation omitted).

The police were entitled to consider context: the Columbine incident had occurred in a high school, resulting in the death of twelve students and one teacher and the wounding of twenty-one others, and plaintiff spoke openly to a group in the teachers' lounge. The perceived threat had to be taken seriously. It was tantamount to yelling "fire" in a theatre. *Schenck*, 249 U.S. at 52.

Defendant's motion to dismiss plaintiff's false arrest and false imprisonment claims is granted.

### C.    Excessive Force Claim

Plaintiff's excessive force claim is founded on her allegation that handcuffs were tightly secured and that police officers refused to loosen them despite her request that they do so. Am. Compl. ¶ 26. This allegation is insufficient to assert a viable claim. *See supra* Part IV.D.1. Milo makes no claim that she suffered any injury beyond temporary discomfort. Am. Compl. ¶ 26. While "overly tight handcuffing can constitute excessive force," the lack of a continuing injury beyond temporary discomfort "is fatal to [an] excessive force claim." *Lynch*, 567 F. Supp. 2d at 468. Milo's complaint alleging that she suffered excessive force at the hands of police officers when they heckled her for being a terrorist is insufficient to state a claim. *See supra* Part IV.D.2.

Defendant's motion to dismiss plaintiff's excessive force claim is granted.

**D.     Free Speech Claim**

Plaintiff's statement regarding her desire to reenact Columbine at Fort Hamilton High School is not protected by the First Amendment. *See supra* Part IV.E.

Her exclamation to school staff, inside a school filled with students and teachers, that "if [she] had a trench coat and a shotgun, it would be Columbine all over again," Am. Compl. ¶ 18, was appropriately evaluated by police as a serious threat. *See supra* Part IV.B. Plaintiff's reference to one of this nation's most haunting public schoolhouse tragedies—the seriousness of which was buttressed by her refusal to retract the statement, Farrar Decl., Exs. B & C—is not protected speech. Whether she had the intention of carrying out the threat is of no consequence, *Black*, 538 U.S. at 359–60; the prohibition of such threats is meant to "protect individuals from . . . the possibility that the threatened violence will occur," *R.A.V.*, 505 U.S. at 388. "The freedom to exercise one's right of free speech is often curtailed temporally, geographically or even demographically." *Turner*, 2009 WL 7265601, at *1. "Freedom of speech . . . is not an unfettered right for any U.S. citizen." *Finkle*, 386 F. Supp. 2d at 125.

Alternatively, plaintiff's claim fails because speech on schoolhouse grounds that threatens the prospect of danger to the school population is not protected:  school attendance creates a captive group of persons protected only by limited school personnel. *See Morse*, 551 U.S. at 424 (Alito J., concurring). *See also supra* Part IV.E.2.

Defendant's motion to dismiss plaintiff's free speech claim is granted.

**E.     Unconstitutional Confinement and Deliberate Indifference to Medical Needs Claim**

Plaintiff alleges that, at the police precinct, she was handcuffed to a pole for nine hours and was denied water throughout this period, despite having told the police that she was hypoglycemic and required water. Am. Compl. ¶¶ 28–30.  She claims she was only

20

unhandcuffed to be processed, to use the restroom and to speak with her attorney. *Id.* ¶ 28. These alleged violations of plaintiff's basic human needs are evaluated under the deliberate indifference standard. *See supra* Part IV.F. Plaintiff satisfies the standard. *See supra* Part IV.F.1. She claims that (1) by being denied water for nine hours, she was denied a basic human need; (2) she put an officer on notice of her medical condition, which required her to drink water often; and (3) he ignored her need. Am. Compl. ¶¶ 29–30. *See also Jabbar*, 683 F.3d at 57 ("[P]risoners may not be deprived of their basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—and they may not be exposed to conditions that pose an unreasonable risk of serious damage to their future health.").

She has failed to sue the officer or officers she allegedly told about her medical condition and who denied her water, any of the officers present who failed to intervene, or one or more responsible superiors at the precinct. *See supra* Part IV.F.2. Her counsel concedes that the statute of limitations prevents joining a new defendant. Hr'g Tr. Nov. 10, 2014.

The claim for deliberate indifference to plaintiff's medical needs is dismissed.

Allowing her to amend her complaint would be futile.

## VI.    Conclusion

Defendants' motion to dismiss the case is granted. No costs or disbursements are granted.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

Date:   November 14, 2014
        Brooklyn, New York